Stephanie R. Tatar (237792)
TATAR LAW FIRM, PAC
3500 West Olive Avenue, Suite 300
Burbank, CA 91505
Telephone: (323) 744-1146
Facsimile: (888) 778-5695
Stephanie@thetatarlawfirm.com

*Attorneys for Plaintiff Ruby P. Nance*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBY P. NANCE<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC. and EQUIFAX INFORMATION SERVICES LLC<br><br>Defendants. | Civil Action No. 8:14-cv-669<br><br>**COMPLAINT FOR VIOLATION OF FAIR CREDIT REPORTING ACT**<br><br>**DEMAND FOR JURY TRIAL** |

### I.
### PRELIMINARY STATEMENT

1.  Defendants, Equifax Information Services LLC and Experian Information Solutions, Inc., national consumer reporting agencies ("CRA"), have been selling credit reports inaccurately marking Plaintiff as deceased. When they inaccurately report a living consumer as deceased, Defendants makes it practically impossible for that consumer to access credit, as they did with Ms. Nance. Defendants' practice also harms the businesses that purchase their reports; as such companies cannot process credit applications due to the applicant's lack of a credit

1

score. There is no good faith rationale to explain Defendants' practice other than the generation of revenue. If Defendants actually believed that Ms. Nance was deceased, they had no legally permissible basis to sell her reports. If Defendants believed Ms. Nance was alive, they knowingly sold her reports with a gross inaccuracy. Moreover, Defendants know that identity thieves use the credit information of truly deceased persons to commit credit fraud. Defendants thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA"), as set forth below.

## II.

### JURISDICTION AND VENUE

2. Jurisdiction of this court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## III.

### PARTIES

4. Plaintiff Ruby P. Nance is an adult individual who resides at Jackson Springs, NC.

5. Defendant Experian Information Solutions, Inc. ("Experian") is a business entity that regularly conducts business in the Central District of California, and which has its headquarters and a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626.

6. Defendant Equifax Information Services LLC ("Equifax") is a business entity that regularly conducts business in the Central District of California, and which has its headquarters and a principal place of business located at 1550 Peachtree Street Northeast, Atlanta, GA 30309.

## IV.

## FACTUAL ALLEGATIONS

*Defendant's Practices Concerning the Sale of Reports on the "Deceased"*

7.  Defendants are regulated as "consumer reporting agencies" ("CRA") under the FCRA.  15 U.S.C. § 1681a(e).

8.  Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.  15 U.S.C. § 1681a(e).

9.  Pursuant to the FCRA, Defendants must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

10. Pursuant to the FCRA, Defendants must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

11. Defendants place a "deceased" notation or marking on reports when they are advised from any of their many data furnishing sources that a given consumer is deceased.

12. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

13. Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

14. Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's reports.

15. Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

16. A deceased notation is a very unusual marking upon a credit file or credit report.

17. In some cases, in order to assure accuracy, Defendants send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax and Experian credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.  But Defendants have no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendants to be placed in said consumer's credit file or report.

18. Defendants regularly receive the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased.   But Defendants do not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

19. Defendants will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

20. Indeed, Defendants employ no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

21. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

22. Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

23. Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

24. Nevertheless, Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

25. Upon Defendants' reports with a "deceased" mark sold to third parties Defendants never calculate or provide a credit score for that consumer.

26. Defendants know that third party credit issuers use a credit score in order to process a given credit application.

27. Defendants know that many third party credit issuers require a credit score in order to process a given credit application.

28. Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

29. Defendants know that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

30. Defendants have been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

5

31. Defendants have received and documented thousands of disputes from consumers complaining that their Equifax and Experian credit reports have them erroneously marked as "deceased."

32. Defendants know that thousands of consumers are erroneously marked as "deceased" on their Equifax and Experian credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

33. Nevertheless, Defendants employ no procedures which assure that a consumer marked as "deceased" on one of Defendants' reports is, in fact, deceased.

34. Even consumers who dispute the erroneous "deceased" status on their Equifax and Experian credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

35. Defendants have no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

36. Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

37. For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

38. Defendants will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax and Experian – meaning that nobody is continuing to buy those reports from Equifax and Experian.

39. Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

40. Defendants profit from the sale of reports on the deceased.

41. Defendants have in its credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

42. Defendants know that truly deceased consumers do not apply for credit.

43. Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax and Experian to be a common and major source of identity theft.

44. Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

45. Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

46. Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

47. Indeed, Defendants sell reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

48. For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendants to ever sell their credit reports, absent a court order.

7

49. Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

*Case Specific Facts*

50. Plaintiff had been marked by Defendants as "deceased" on her Equifax and Experian credit reports.

51. Plaintiff is not deceased.

52. Defendants did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about her to third parties marking her as "deceased."

53. Notwithstanding Plaintiff's efforts, Defendants continue to publish and disseminate such inaccurate information to other third parties, persons, entities and credit grantors. Defendants have repeatedly published and disseminated consumer reports to such third parties from at least April 2013 through the present.

54. As a result, Defendants made it practically impossible for Plaintiff to obtain credit.

55. As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form of credit denial or loss of credit opportunity, credit defamation and emotional distress, including anxiety, frustration, embarrassment and, humiliation.

56. At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

57. At all times pertinent hereto, the conduct of the Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless,

and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## V.
### FIRST CLAIM FOR RELIEF – EXPERIAN AND EQUIFAX
*Violation of FCRA*

58. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

59. At all times pertinent hereto, Defendants were "persons" and "consumer reporting agencies" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

60. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

61. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

62. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Experian and Equifax are liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b).

63. The conduct of Defendants was a direct and proximate cause, as well as a substantial factor, in bringing about the injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## VI.
### JURY TRIAL DEMAND

64. Plaintiff demands trial by jury on all issues so triable.

## VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendants, based on the following requested relief:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

    (d)    Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

    (e)    Such other and further relief as may be necessary, just and proper.

Dated: April 29, 2014

Respectfully Submitted,

_____
Stephanie R. Tatar
Tatar Law Firm, APC
3500 West Olive Avenue
Suite 300
Burbank, CA 91505
Telephone: (323) 744-1146
Facsimile: (888) 778-5695